UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

GOLDWELL OF NEW JERSEY, INC.,
*t/a Goldwell Mid-Atlantic*,

Plaintiff,

v.

Civ. Action No. 07-3919 (KSH)

KPSS, INC.,
*d/b/a Goldwell*,

Defendant.

OPINION

**KATHARINE S. HAYDEN, U.S.D.J.**

I.      **INTRODUCTION**

This contract dispute arose out of a series of exclusive regional distributorship agreements between a manufacturer of hair care products, defendant KPSS, Inc. ("KPSS"), and one of its distributors, plaintiff Goldwell of New Jersey, Inc., *d/b/a* Goldwell Mid-Atlantic ("Mid-Atlantic").  The agreements, which by their terms would expire on December 31, 2007, granted Mid-Atlantic exclusive sales rights (and imposed corresponding obligations) for certain territories, one of which was the State of New Jersey.  Six months before the agreements' expiration date, KPSS notified Mid-Atlantic that it would not renew the agreements, citing poor sales figures.  Mid-Atlantic thereafter disavowed its obligation to perform under the not-yet-expired agreements, and eventually filed this action under the New Jersey Franchise Practices Act ("NJFPA"), N.J.S.A. § 56:10-5, *et seq*., claiming that KPSS unlawfully signaled its intent not to renew the distributorship agreements.  KPSS counterclaimed, alleging, *inter alia*, breach

1

of contract and trademark infringement.  Now before the Court are the parties' cross-motions for summary judgment.

## II.   JURISDICTION

The Court has diversity and federal question jurisdiction.  Mid-Atlantic is a corporate citizen of New Jersey and is headquartered in this state; its amended complaint alleges a claim in excess of $75,000 against KPSS, which is incorporated in Delaware and headquartered in Maryland.  Am. Compl. ¶¶ 3-4 [D.E. # 16]; 28 U.S.C. § 1332.  KPSS's amended counterclaim also invokes diversity jurisdiction and in addition alleges a federal cause of action under the Lanham Act.  Am. Counterclaim ¶¶ 3 [D.E. # 17], 76-78; 28 U.S.C. §§ 1331; 15 U.S.C. § 1121.  Venue is proper since a substantial part of the events giving rise to the claims asserted occurred in this district.  28 U.S.C. § 1391(a).[1]

## III.   FACTS & PROCEDURAL HISTORY[2]

### A.  The Parties

KPSS is a domestic subsidiary of KPSS GmbH ("Goldwell Germany"), a German corporation that markets professional hair care and other beauty products around the world.  Pl. Facts ¶¶ 3-4.  Goldwell Germany, itself a subsidiary of a Japanese parent corporation ("KPSS Japan"), entered the United States hair product market in 1982, and established KPSS in 1986 in

---

[1] The agreements at issue here contain forum selection clauses requiring disputes arising out of the contracts to be litigated in Maryland.  Such clauses, however, are presumptively invalid where they appear in contracts subject to the NJFPA, *see Kubis & Perszyk Assocs. v. Sun Microsystems, Inc.,* 146 N.J. 176, 192-93 (1996), and KPSS does not attempt to rebut the presumption in this case.

[2] Pursuant to Loc. Civ. R. 56.1, the parties have each submitted a statement of material facts for which they opine no genuine issue of material fact exists, and a corresponding response to the other's moving statement.   The facts discussed herein are taken from these submissions, as well as supporting affidavits, and where appropriate, legal memoranda.  The Court will refer to each party's moving statement of facts as "Pl. Facts" and "Def. Facts," respectively, and will refer to the parties' responses thereto as "Pl. Resp." and "Def. Resp.," respectively.  Affidavits will be denominated "Aff.," declarations "Decl.," and briefs will be abbreviated "Br.," "Opp. Br.," and "Rep. Br.," where appropriate.

furtherance of that endeavor.  *Id.* ¶ 4; Aff. of Aaron Frankel ("Frankel Aff.") ¶¶ 9-10; Def. Resp. ¶ 4.   KPSS, through Goldwell Germany, has the exclusive right in the United States to use and license certain registered trademarks (the "Goldwell marks" or the "trademarks") related to the Goldwell brand name.  Def. Facts. ¶ 5; Pl. Facts ¶ 5.  The Goldwell name, created in 1948, is widely known to the public as a source of high-quality hair care products ("Goldwell products"), and the Goldwell marks carry with them a substantial amount of goodwill.  Def. Facts ¶¶ 6-7; Pl. Facts ¶ 9.  As of 2005, KPSS claimed to be the eighth largest provider (by revenue) of hair care products to North American salons and day spas, with revenues in 2006 of $102 million.  Pl. Facts ¶ 13.

Mid-Atlantic was at all times relevant here an exclusive regional distributor of Goldwell products under a series of regional buying agreements ("RBAs").  Pl. Facts ¶ 6.  It began selling Goldwell products under an RBA with Goldwell Germany in 1982, and thereafter entered into similar agreements with KPSS upon its 1986 formation.  Pl. Facts ¶ 6; Frankel Aff. ¶ 12.  Throughout most of its contractual relationship with KPSS (and before that, Goldwell Germany), Mid-Atlantic had sold Goldwell products only in the State of New Jersey.  Pl. Facts ¶ 6; Frankel Aff. 17; Def. Resp. ¶ 6.  More recently, however, KPSS and Mid-Atlantic expanded their relationship to cover a number of other territories, discussed below.

### B.  The Agreements

As briefly referenced above, KPSS and Mid-Atlantic entered into a series of exclusive RBAs in 1986.  Most recently, the parties operated under three RBAs covering certain territories throughout the eastern seaboard.  These agreements, known as the "New Jersey RBA," the "North Carolina RBA," and the "Multi-State RBA," granted Mid-Atlantic exclusive distributorship rights of Goldwell products in the territories covered by the agreements (the

3

"covered territories"). Def. Facts. ¶¶ 10; Pl. Facts ¶ 8. Each RBA was comprised of a roughly 20 page standardized agreement, followed by two schedules explicating detailed prescriptions and covenants binding upon the parties. The material portions of the agreements are reproduced below.

       1. <u>Standardized Provisions</u>

  The New Jersey and North Carolina RBAs granted exclusive distribution rights to Mid-Atlantic for those states, and the Multi-State RBA granted substantially similar rights in Delaware, Maryland, Virginia, Bermuda, North Carolina, Washington, D.C., and portions of West Virginia. Pl. Facts ¶¶ 6, 8; Frankel Aff. ¶ 17; Def. Facts ¶ 10; Decl. of Paul R. Marino ("Marino Decl.") Exhs. B, C, D.[3] The parties executed the New Jersey RBA on January 1, 2003 and the North Carolina and Multi-State RBAs on January 1, 2005; all three RBAs would expire on December 31, 2007. Def. Facts ¶¶ 10, 21; NJ RBA at 1-2, 22.

  Sections 2.1 and 2.2 of the RBAs prohibited Mid-Atlantic from selling (or seeking to sell) Goldwell products outside the respective territory, and prohibited KPSS from selling (or allowing anyone other than Mid-Atlantic to sell) its own products within the specified territories, except under limited circumstances appearing enumerated in the agreements. NJ RBA at 2, 4. These provisions state:

> 2.1 For the term of this Agreement, and subject to the terms and conditions hereof, [KPSS] agrees to sell [Goldwell] Products to [Mid-Atlantic] for the purpose of [Mid-Atlantic's] sale and distribution of [Goldwell] Products solely to Customers located in the Territory.

---

[3] The three RBAs are attached as Exhibits B, C, and D to the Marino Declaration. Hereafter, all citations to the RBAs will be designated "NJ RBA," "NC RBA," and "MS RBA," respectively. Unless otherwise noted, the provisions in each RBA are identical. In the interest of brevity, the Court will cite only the New Jersey RBA where the RBAs do not materially differ.

> 2.2    Provided [Mid-Atlantic] is not in default hereunder, [KPSS] shall not intentionally makes sales or intentionally allow others to makes sales of [Goldwell] Products to Customers located in the Territory, except as may otherwise be permitted pursuant to Section [3] of this Agreement, or as otherwise provided below

NJ RBA at 2.[4]

Section 3(b) of the New Jersey RBA specifies the operative term of the agreements; it

states in full:

> No later than six (6) months prior to the last day of the initial term or, if applicable, any subsequent term (the "Ending Date"), [Mid-Atlantic] shall notify [KPSS] in writing of whether or not [it] desires an extension of the term of this Agreement beyond the Ending Date.  If [Mid-Atlantic] notifies [KPSS] that it desires such an extension and [KPSS] is willing to grant an extension, [KPSS] may propose to [Mid-Atlantic] the terms of an extension acceptable to [KPSS] and such extension shall be effective only if both parties, by their duly appointed officers, sign a written extension agreement providing for such an extension.  If [KPSS] elects not to extend the term of this Agreement (*which it may do at its sole and absolute discretion*), or if the parties have not signed such a written extension agreement at least four (4) months prior to the Ending Date, this Agreement shall expire as scheduled on [December 31, 2007].  In such event, during the ninety (90) days immediately preceding the Ending Date (the "Transition Period"), [KPSS] shall have the right to sell and distribute, either directly or through its designee, Products in the Territory, notwithstanding that [Mid-Atlantic] shall have the (non-exclusive) right during the Transition Period to sell and distribute [Goldwell] Products in the Territory.

NJ RBA at 4 (emphasis added).[5]  This provision is self-explanatory:  KPSS had the unfettered

discretion under the contracts to renew or not renew the parties' relationship.  If KPSS opted not

to renew (or Mid-Atlantic did not request such a renewal), the agreements prescribe a transition

---

[4] Additional subparagraphs in § 2.2, not relevant here, set out certain requirements for the eligible salons to which Mid-Atlantic would be permitted to sell Goldwell products, as well as  prescribed certain commissions related to Mid-Atlantic sales to those customers.  NJ RBA at 2-4.

[5] Identical provisions appear at § 3.2 of the North Carolina and Multi-State RBAs.

period under which the parties each have the right to distribute Goldwell products until they go about their separate ways.

Section 4 of the RBAs enumerates certain restrictive covenants upon Mid-Atlantic. Relevant here, Mid-Atlantic was prohibited, without KPSS's prior written consent, from:

> 4.2   Mak[ing] or assist[ing] in any sale, exchange or other transfer of [Goldwell] Products to any other Goldwell distributor;
>
> 4.3   Seek[ing] any customers, establish[ing] any branch, or maintain[ing] any distribution facility, with respect to the [Goldwell] Products, outside of the Territory; . . .
>
> 4.5   Engag[ing] (either directly or indirectly) in any other line of business other than as permitted by and contemplated in th[e] Agreement, including, but not limited to the retail hair or beauty salon business;
>
> 4.6   Sell[ing] or market[ing] (either directly or indirectly) any goods in the Territory other than [Golwell] Products except to the extent, if any, specifically authorized [elsewhere in the RBA].

NJ RBA at 5.  Section 4.6 of each RBA states that Mid-Atlantic would be permitted to sell non-Goldwell product lines as authorized in Schedule B (for the New Jersey RBA) and Schedule A (for the North Carolina and Multi-State RBAs).  Specifically, § II on Schedule B to the New Jersey RBA permitted Mid-Atlantic to do the following with respect to marketing non-Goldwell items:

> A.   Notwithstanding section 4.5 of the Agreement, [Mid-Atlantic] may engage in the Territory in other lines of business that do not, in the reasonable judgment of [KPSS], reflect adversely on the name or reputation of Goldwell.
>
> B.   Notwithstanding section 4.6 of the Agreement, [Mid-Atlantic] (a) may sell and market in the territory products not part of another hair product line that are related to hair care of skin care and do not otherwise violates nay provision   or restriction of this Agreement; and (b) may

> carry for sale in the territory other lines of hair products, other than the [Goldwell] Products, that are sold by an entirely separate sales force, so long as such lines are approved by [KPSS] in its sole discretion. . . .

NJ RBA at 25. Section XIII on Schedule A to the North Carolina and Multi-State RBAs are more permissive; they contain substantially the same language (though not identical) as the New Jersey RBA, but also state the following:

> B.    In addition to [Goldwell] Products, [Mid-Atlantic] shall be permitted to sell in the Territory the following brands of hair care products (the "Other Brands"):
>
> KMS, Tahe[,] and Repechage.

NC & MS RBAs at 27.

Section 5 of the RBAs, entitled "Sale and Purchase of Products," prescribes a protocol for ordering, pricing, and shipment of the Goldwell products. As is relevant here, § 5.3.1 states that KPSS "shall invoice [Mid-Atlantic] for Products delivered hereunder not earlier than the date of shipment, and payment of the entire purchase price and all other charges associated with the purchase order shall be due upon receipt of such invoice." NJ RBA at 6.

Section 6 sets forth other sundry obligations upon Mid-Atlantic. The relevant provisions here read as follows:

> 6.1    Best Efforts. [Mid-Atlantic] shall continuously exercise its best efforts to promote the sale and distribution of [Goldwell] Products throughout the Territory in compliance with all applicable laws.[6]
>
> 6.2    Minimum Purchase, Sales, and/or Buying Account Requirements. [Mid-Atlantic] agrees to achieve all of the minimum purchase, sales, and/or buying account requirements which are set forth on Schedule A.

---

[6] Under the North Carolina and Multi-State RBAs, additional obligations regarding stock quotas were imposed upon Mid-Atlantic. NC & MS RBAs at 8. These provisions are not relevant here.

7

6.3   <u>Facilities and Staff</u>.   [Mid-Atlantic] shall maintain a suitable place of business, a separate qualified full-time sales staff devoted exclusively to the sale of [Goldwell] Products, and a qualified technical staff to sell and support the [Goldwell] Products in the Territory.  Requirements for sales and technical staff are as set forth on <u>Schedule A</u>.

6.4   <u>Activity Reports</u>.     On or before the tenth (10th) day of every month, [Mid-Atlantic] shall submit to [KPSS] a sales report . . . showing the sales of each [Goldwell] Product and of each Product category made by [Mid-Atlantic] during the preceding month, in total within the Territory. . . .

6.7   <u>Training and Instruction</u>.   [Mid-Atlantic] shall provide adequate and appropriate training and instruction to Customers in Goldwell's recommended application and use of the [Goldwell] Products.   In this connection, [Mid-Atlantic] shall not permit the sale of any [Goldwell] Products except by adequately trained and competent sales personnel, qualified to train Customers in the application and use of the [Goldwell] Products. . . .

NJ RBA at 7-9.[7]

Section 7 places certain obligations on KPSS:

7.1   <u>Sales Materials</u>.   [KPSS] shall provide to [Mid-Atlantic] reasonable quantities of Sales information, literature, materials and aids concerning the [Goldwell] Products and the sale, maintenance and repair thereof, and the prices for such items shall not exceed those charged by [KPSS] to other distributors, for similar quantities.

7.2   <u>Technical Guidance</u>.  [KPSS] shall provide, upon request of [Mid-Atlantic], such additional technical services as [KPSS] deems necessary to assist [Mid-Atlantic] in the use of the [Goldwell] Products.

NJ RBA at 10.

Section 11[8] concerns the permissible use of the Goldwell marks.  The section's lengthy

subparagraphs read in part:

---

[7] Section 6.11 in the North Carolina and Multi-State RBAs also set forth detailed insurance requirements upon Mid-Atlantic.  These provisions are not relevant here.

11.1   [Mid-Atlantic] and [KPSS] expressly acknowledge that all industrial and intellectual property rights in and to the packages and labels used in connection with the [Goldwell] Products and the trademarks, trade names, services marks, services names and logos and copy used on the [Goldwell] Products, including but not limited to the name "Goldwell" (the "Goldwell Trademarks") are the sole and exclusive property of [KPSS] and its affiliates. During the term of this Agreement (including any renewal hereof) and at all times thereafter [Mid-Atlantic] shall not assert or claim any rights in, or use other than pursuant to written agreement with [KPSS], or take any action which may prejudice or impair the validity of, or title by [KPSS] or its affiliates to, the Goldwell Trademarks (or any marks similar thereto, including similar marks on goods unrelated to the [Goldwell] Products) or trade material appearing on, or used in connection with, the [Goldwell] Products or the advertising, promotion or packaging thereof. [Mid-Atlantic] shall cooperate with [KPSS] and its affiliates in safeguarding the Goldwell Trademarks and shall promptly notify [KPSS] of any actual or threatened infringement thereof which may come to [Mid-Atlantic's] attention. . . .

11.2   [Mid-Atlantic] shall not use, make reference to, publish, copy or otherwise designate, either orally, in writing, or in any matter whatsoever, any Goldwell Trademarks in connection with [Mid-Atlantic's] advertising, promotion or sale of the [Goldwell] Products or for any other reason whatsoever except (a) when done for the benefit of [KPSS], and (b) in a manner that has been either provided by [KPSS] in writing or approved in advance in writing by [KPSS]; provided, however, that references to the Goldwell Trademarks in non-public communications in the course of [Mid-Atlantic's] business need not be so approved. The "Goldwell" mark may continue to be used as part of [Mid-Atlantic's] business name as long as this Agreement is in effect, subject to [KPSS's] right to require [Mid-Atlantic] to cease such use on not less than six (6) months prior written notice to do so. . . .   [Mid-Atlantic] shall discontinue and refrain from all such advertising or representation in any use whatsoever of said Marks or of simulations thereof upon the termination of this Agreement.

---

[8] Sections 8, 9, and 10 deal with warranties, the limitation thereof, and limitations to liability, respectively, and are not pertinent to this dispute.

NJ RBA at 11-12.  Mid-Atlantic agreed in a related provision that post-termination use of the Goldwell marks would "result in confusion to the public and irreparable damage to [KPSS] such that money damages [would] be an inadequate remedy and injunctive relief . . . [would be] justified and appropriate."  NJ RBA at 25-26.

Section 15[9] sets forth the grounds upon which either party may terminate the Agreement. The relevant termination events are as follows:

> 15.1  [Termination] At [KPSS's] Option.  Except as otherwise required by law, and notwithstanding any other provision contained herein, to the contrary, this Agreement, and the relationship hereby created, may be terminated by [KPSS] with respect to any or all [Goldwell] Products and/or any or all parts of the Territory immediately upon written notice to [Mid-Atlantic] and without opportunity to cure in the event that:
>
>> 15.1.2  Any indebtedness owing to [KPSS] by [Mid-Atlantic] becomes more than thirty (30) days past due;
>>
>> 15.1.3  [Mid-Atlantic] fails to comply with any term of Section 2.1 of this Agreement[10];
>>
>> 15.1.4  [Mid-Atlantic] fails to comply with any term of Section 4 [(unauthorized sale of non-Goldwell products)] of this Agreement; . . .
>>
>> 15.1.6  [Mid-Atlantic] fails to satisfy any minimum purchase, sales volume, and/or buying account requirement

---

[9] Sections 12 and 13 are not pertinent here.  Though not directly relevant to the dispute, the parties expressly state in § 14 that the RBAs create a buyer-seller relationship, and do not create an agency relationship.  NJ RBA at 13.

[10] Subsection 15.1.3 of the North Carolina and Multi-State RBAs also expressly state that failure to comply with § 2.2.1(f) is a ground for termination.  Section 2.2.1(f) in turn states that failure to establish and maintain the number of required stores shall be a material breach of the contract.  NC &MS RBA at 4.

referred to in <u>Section 6.2</u> of this
Agreement;

15.1.7 [Mid-Atlantic] fails to satisfy and
facilities, sales, or technical staff
requirement referred to in <u>Section
6.3</u> of this Agreement; . . .

15.1.9 [Mid-Atlantic] fails to comply with
any term of <u>Section 11</u> of this
Agreement;

15.1.11 [Mid-Atlantic] materially fails to
perform any obligation under this
Agreement, or materially breaches
any covenant required to be
performed by [Mid-Atlantic]
hereunder which is not referred to
in <u>Section 15.1.1</u> through <u>15.1.10</u>
above, which failure is not cured
by [Mid-Atlantic] within thirty
(30) days after written notice from
[KPSS].

NJ RBA at 13-14 (underline in original).  Under § 15, KPSS also had the right to repurchase any

unsold inventory in Mid-Atlantic's possession upon termination of the agreement.  *Id.* at 15.

Unlike its counterpart, Mid-Atlantic had the option to terminate the RBAs only if KPSS

ceased to function as a going concern or if KPSS "materially fail[ed] to perform any of its

obligations" and did not cure the breach within ninety days of Mid-Atlantic's written notice.  NJ

RBA at 14.

Section 17[11] sets forth several miscellaneous provisions.  Section 17.2 states in relevant

part that "[t]he failure of either party to enforce at any time or for any period of time any

provision of this Agreement shall not be construed to be a waiver of such provision or of the

right of such party thereafter to enforce each and every such provision."  NJ RBA at 15.  Section

_____

[11] Section 16 of the RBAs is not pertinent here.

17.4 stipulates that the RBAs "shall be governed by, subject to and interpreted in accordance with the laws of the States of Maryland."  NJ RBA at 16.

>>>2.   Appended Schedules

Incorporated as part of the RBAs are one or more schedules specifically listing the requirements referenced in the standard provisions of the agreements.  Appended to the New Jersey RBA are two such schedules, A and B; only one schedule (Schedule A) appends the North Carolina and Multi-State RBAs.  Notably, the North Carolina and Multi-State RBAs explicitly state on Schedule A that they "shall not affect the separate and independent" character of both the New Jersey RBA, and each other.  NC & MS RBAs at 28.  The New Jersey RBA, executed before the others, also contains a similar provision on Schedule B that disclaims connection to the non-New Jersey RBAs then in place.  NJ RBA at 26.

To the extent not already discussed, the relevant requirements set forth in the schedules are reproduced below.

>>>**a.   Minimum Purchase, Sale and/or Buying Account Requirements**

Schedule A to the RBAs prescribes Mid-Atlantic's minimum annual purchase and "Net Sales" requirements.  Relevant here, Mid-Atlantic was required to meet the following quotas for 2006:  $7,375,000 in New Jersey, $2,975,000 in North Carolina, and $4,785,000 in the various locations covered by the Multi-State RBA, for an aggregate sum of $15,135,000.  Def. Facts ¶¶ 27-29.  Schedule A to each separate RBA also states that "[a]ll sales and purchases with respect to the Territory shall be reported by [Mid-Atlantic] to [KPSS] on a monthly basis."  NJ RBA at 21.  Under the agreements, the term "Net" means "gross sales or gross discounts, as the case may be, calculated net of all promotional discounts and/or products returns."  NJ RBA at 20.  The provision further states that "[i]t is agreed for purposes hereof that the term 'promotional

discounts' as applied to sales (not purchases) shall not include the following discounts that [KPSS] (at its discretion) currently offers:  Business Development Fund ("BDF") credits, chain sales credits, school discount credits, and Goldwell Salon Alliance ("GSA") rewards credits." *Id.*  The Court discusses proper calculation of Mid-Atlantic's net purchasing requirements later in this opinion.

### b.  Management, Sales and Technical Staff Requirements

Schedule A to each RBA also specifies minimum staffing requirements.  Each RBA required Mid-Atlantic to maintain at least one full-time sales manager and full-time educator.  NJ RBA at 8.  Mid-Atlantic was also required to hire part-time technical assistants and sales representatives, the numbers of which vary under the agreements.  The New Jersey RBA requires Mid-Atlantic to maintain 12 technical associates and 15 sales representatives; the North Carolina RBA require eight technical associates and nine sales representatives; and the Multi-State require ten technical associates and 13 sales representatives.  NJ RBA at 22; NC RBA at 24; MS RBA at 24.  The RBAs require full-time sales and education staff to devote a minimum of 30 hours per week exclusively to, depending upon the position, education, territory management, or sales with respect to Goldwell products.  NJ RBA at 24.  They require part-time technical associates to conduct a minimum of two half-day classes per month with respect to Goldwell Products.

### C.  The Dispute

In August 2006, Mario Argenti ("Argenti") became president of KPSS.  Pl. Facts ¶ 31.  Mid-Atlantic alleges that upon Argenti's hire, KPSS instituted a plan to achieve greater distributor "market penetration" by consolidating or eliminating some its smaller distributors.  Pl. Facts ¶ 34.  As evidence of this alleged "plan to replace the mom and pop distributors with a large, national distributor," Mid-Atlantic proffers an e-mail from Thomas Deickhoff (Deickhoff

e-mail") of KPSS Germany, dated May 3, 2007, to Nomura Tadashi of KPSS Japan.  Pl. Facts ¶

35.  The e-mail explained that KPSS was "getting close to agreeing to [a] basic distribution

contract" with Beauty Systems Group ("BSG"), a national distributor.  The e-mail further states

in pertinent part:

> As we had talked to you before, we are planning to replace
> underperforming distributors [with] BSG in order to improve the
> sales and profession store presence of [Goldwell] in the
> United States. . . .
>
> We will execute the move to BSG in essentially four waves . . . .
> The basic approach is that we will inform underperforming
> distributors and distributors whose distribution contract will soon
> expire that we will no prolongate [sic] their contract.  Instead, we
> [will] recommend to them to get in contact with BSG who will
> submit an offer to acquire their sales teams and to take over the
> distribution rights immediately.  <u>This will be an offer hardly [sic]
> to ignore for those distributions because, without the distribution
> contract for [Goldwell], they will not be able to keep their business
> alive</u>.

Pl. Facts ¶ 35 (underline emphasized in Pl. Facts).

KPSS disputes that it had any plan to eliminate its smaller regional distributors with one

national distributor.  Def. Resp. ¶¶ 34-37.  Argenti denied at his deposition that it was his strategy

to consolidate distributors, but that it was "always [his strategy] to service the market, and I will

use every mean[s] possible at [KPSS's] disposal to achieve that goal. . . ."  Opp. Decl. of Paul

Marino ("Marino Opp. Decl.") Exh. A at 170:8-14.

Notwithstanding the requirement in § 6.4 of the RBAs that Mid-Atlantic provide KPSS

with a report showing the "sales made by Mid-Atlantic during the preceding month, in total

within the Territory," NJ RBA at 8, Mid-Atlantic reported to KPSS its 2006 sales figures by

aggregating them across the covered territories.  Pl. Facts ¶ 51; Def. Facts ¶ 64.  In 2003 and

2004, however, Mid-Atlantic had complied with § 6.4 by submitting monthly sales figures broken

14

down by territory.  Marino Opp. Decl. Exh. F at 35:18-36:12.  Thereafter, Mid-Atlantic began submitting the aggregated sales figures to KPSS, despite alleged requests from KPSS that it provide the information with a territorial breakdown.  *Id.* Exh. F. at 37:9-22.  Despite these requests and the fact that it had submitted territory-specific activity reports to KPSS in 2003 and 2004, Mid-Atlantic alleges that "from 2004 to 2006, it was the regular practice of the parties for Mid-Atlantic to provide aggregate sales information to KPSS."  Pl. Resp. ¶ 64.  In any event, Mid-Atlantic reported aggregate sales of $13,779,000 in 2006.  Def. Facts ¶ 64; Marino Decl. Exh. S.  Based on the territorial figures that Mid-Atlantic had provided over 2003-2004, KPSS extrapolated a breakdown-by-territory for the 2006 sales figures, and compared them to the sales requirements mandated by Schedule A to the RBAs:

| Territory | Minimum Requirement | Sales | Difference | Difference (%) |
|---|---|---|---|---|
| New Jersey | $7,375,000 | $6,947,040 | $427,960 | 5.80% |
| Mid-Atlantic | $4,785,000 | $4,207,006 | $577,994 | 12.08% |
| North Carolina | $2,975,000 | $2,624,953 | $350,047 | 11.77% |
| Total | $15,135,000 | $13,779,000 | $1,356,000 | 8.96% |

Marino Decl. Exh. S.  KPSS has submitted an additional table documenting Mid-Atlantic's actual sales figures for 2006; under those figures, Mid-Atlantic sold $6,634,170 in Goldwell products in New Jersey, a shortfall of $740,830 (i.e., a 10.04% deviation from its minimum requirement). Mid-Atlantic's sales figures for North Carolina and the Multi-State territories fared a bit better than KPSS had estimated, although still presented a shortfall from the required quotas.  Marino Decl. Exh. U; Def. Facts ¶ 65.[12]

---

[12] As the Court will discuss, Mid-Atlantic disputes the accuracy of the "Net" sales figures as defined by the RBAs and submitted by KPSS.  Pl. Resp. ¶¶ 65-66.

Upon hearing rumors from his sales force beginning in late 2006 that KPSS was planning to replace Mid-Atlantic as one of its regional distributors, Aaron Frankel ("Frankel"), Mid-Atlantic's president, met with KPSS's vice-president of sales, John Fortunato ("Fortunato") in February or March 2007[13] to determine if the rumors were true.  Pl. Facts ¶ 38; Frankel Aff. ¶¶ 25-27; Def. Resp. ¶ 38.  Mid-Atlantic claims, and KPSS disputes, that Fortunato "assured Frankel" that KPSS was not in negotiations with other distributors to potentially replace Mid-Atlantic and that the rumors were "absolutely not true."  Pl. Facts ¶ 39; Frankel Aff. ¶ 28; Def. Resp. ¶ 39.  Fortunato testified at his deposition that he told Frankel "that there are always rumors in the market, don't pay attention to them, focus on your business."   Marino Opp. Decl. Exh. I at 30:23-31:1.  He also testified that he informed Frankel that KPSS wanted "more productivity out of [KPSS's] full service sales force." *Id.* at 29:6-7.

Meanwhile, KPSS had begun negotiating with BSG in March 2007 and they executed a non-binding letter of intent on March 28, 2007; this letter signaled a possible future exclusive distributorship agreement.   Pl. Facts ¶ 42, Decl. of Frank A. Reino ("Reino Decl.") Exh. A at KPSS 13389-90.  Ultimately, KPSS and BSG signed such a preliminary agreement to enter into replacement RBAs with BSG ("BSG Agreement)".  Under the BSG Agreement, each replacement RBA would, as is relevant here, be "effective on the date immediately following the date on which such distributor's [existing] distribution agreement with KPSS with respect to its territory . . . expires and can be lawfully terminated without liability to KPSS."  Marino Opp. Decl. Exh J. at 13392-93.  KPSS subsequently entered into RBAs with BSG at an indeterminate time covering the North Carolina and Multi-State Territories.  KPSS did not enter into an RBA with MSG covering New Jersey, but instead executed an RBA with another distributor, DePasquale Salon

---

[13] Frankel states in his own affidavit that the meeting took place in March 2007, while Fortunato testified that it occurred in February 2007.  Frankel Aff. ¶ 27; Marino Opp. Decl. Exh. I at 30:17:21-23.

Systems ("DePasquale") because, as Argenti testified, KPSS "believed that BSG did not service and could not service the area as well as we would like to." Reino Decl. Exh. A at 116:17-24. Pursuant to § 3(b) of the New Jersey RBA and § 3.2 of the North Carolina and Multi-State RBAs (the transitional period pursuant to which Mid-Atlantic and KPSS or a KPSS designee may sell Goldwell products concurrently), KPSS did not permit BSG and DePasquale to begin distributing Goldwell products within the covered territories until October 2, 2007. Marino Opp. Decl. Exh. I at 48:18-49:5.

On April 16, 2007, Frankel (along with his father, Bruce) formed Color Mid-Atlantic, LLC ("CMA"), which conducted business substantially similar to Mid-Atlantic. Def. Facts ¶ 49. It appears, in fact, that CMA was materially indistinguishable from Mid-Atlantic. Frankel testified that CMA was, at the time of its formation and thereafter, "in sort of a temporary interim period until the KPSS contract r[an] out." Marino Decl. Exh. E at 8:18-19. CMA had the same owners, and utilized the same warehouse, office address, and employees. *Id.* at 8:18-13. CMA entered into an exclusive distributorship agreement with another company, Sisi Cosmetics, Inc. on May 18, 2007. Def. Facts ¶ 52. Under the agreement, CMA was obligated to purchase and distribute within the covered territories certain hair color products manufactured by Cosmetica Primont, SRL ("Primont"). *Id.* Mid-Atlantic did not inform KPSS of this contractual relationship. Def. Facts ¶ 53.

In early May 2007, Argenti and Fortunato met with Frankel at KPSS's Maryland headquarters. Def. Facts ¶ 54. At the meeting, Argenti and Fortunato expressed dissatisfaction with Mid-Atlantic's sales productivity. Def. Facts ¶ 54. Specifically, KPSS was displeased with the number of salons to which Mid-Atlantic was selling Goldwell products and with the quantity of sales Mid-Atlantic was making overall. Def. Facts ¶ 55. Fortunato thereafter orally informed

Mid-Atlantic that KPSS would not renew the RBAs upon their December 31, 2007 expiration dates, but that KPSS intended to continue to abide by the contracts and expected Mid-Atlantic to do likewise through their termination.  Def. Facts ¶ 57; Marino Decl. Exh. L at 58:5-10.   In a letter dated July 2, 2007, Argenti formally notified Mid-Atlantic of default under the RBAs for a number of reasons, which included:

- "Actively engaging in switching [Goldwell] salons to another line you carry";

- "Possible release of 5 [sales consultants] in less profitable areas";

- "FTEs [Full-Time Educators] being shadowed to ensure there is no push on Goldwell (KPSS) products";

- "Cancellation of all Goldwell education classes for August";

- "KPSS received a copy of a recent flyer of promotion that [Mid-Atlantic] is selling 'discontinued ' Goldwell . . . products through store outlets"

Marino Decl. Exh. M.  The letter reiterated that KPSS would "honor its contractual obligations in the above mentioned contracts through expiration.  Likewise, we expect [Mid-Atlantic] to abide by the contracts as well."  *Id.*

In a letter dated July 12, 2007, KPSS advised Mid-Atlantic that it was aware of Mid-Atlantic's termination of three sales consultants, and that it had learned that four salons were considering "dropping the Goldwell line due to poor customer service issues from [Mid-Atlantic]."  Marino Decl. Exh N.

The next day, July 13, 2007, Fortunato memorialized his earlier notice of non-renewal to Mid-Atlantic.  Marino Decl. Exh. O.  The letter reads in pertinent part:

> As I had told you when I met with you recently, KPSS has decided not to continue or extend any of the [RBAs] . . . .   Although I appreciate the desire expressed in your recent letter to me to continue as a Goldwell . . . distributor, we are not willing to reverse our situation.

> As you know the [RBAs] are in breach because of the failure of Mid-Atlantic to meet the minimum sales requirements thereunder in 2006, and those [RBAs] are subject to termination at any time. Nonetheless, KPSS is willing to let [the RBAs] remain in effect until December 31, 2007 . . . .  If Mid-Atlantic is unable to comply with those agreements and maintain its purchases and sales of Products thereunder . . . KPSS will need to consider terminating the [RBAs] prior to December 31, 2007 . . . .
>
> In addition, Mid-Atlantic must pay all outstanding amounts due KPSS no later than when they are due, and in any event by December 31, 2007 . . . .
>
> As long as [the RBAs] remain in effect, we intend to comply with all of our duties under them, and we expect you to comply with all of your duties under those agreements as well.  We direct your attention in particular to Sections 6.1, 6.2 and 6.3 and Section 15 f each of the [RBAs], including Sections 15.1 and 15.3 . . . .

*Id.*

The same day, Frankel responded in writing to Argenti's letter of July 2, 2007, stating that Argenti's allegations (listed above) were unfounded.  Marino Decl. Exh. P.  Furthermore, Frankel emphasized that Mid-Atlantic was "certainly committed to honoring [its] contractual obligations and [would] continue to perform in the stellar manner that [it] ha[d] always performed, both currently and in the past, including meeting or exceeding the volume quotas in all 3 agreements."  *Id.*

KPSS again provided Mid-Atlantic a notice of non-renewal in a letter dated September 18, 2007.  Marino Decl. Exh. Q.  This letter supplemented KPSS's July 13, 2007 letter by stating additional grounds for non-renewal of the RBAs, including:

- Mid-Atlantic's promotion and sale of Rusk color products in the covered territories, in violation of § 4.6 of each RBA and Schedule A to the New Jersey RBA and Schedule B to the North Carolina and Multi-State RBAs;

- Mid-Atlantic's failure to exercise its best efforts in the promotion and sale of Goldwell products as a result of, *inter*

*alia*, reducing or eliminating Goldwell education classes, disparaging Goldwell products, and encouraging salons to switch to non-Goldwell products, in violation of § 6.1 of the RBAs;

- Mid-Atlantic's failure to timely pay KPSS for Goldwell products ordered, in violation of §§ 5.3.1 and 6.4 of the RBAs;

- Mid-Atlantic's termination of sales and educational staff below the minimum requirements, in violation of § 6.3 of the RBAs; and

- Mid-Atlantic's failure to meet the minimum sales quotas for 2006, in violation of § 6.2 of the RBAs.

*Id.* The letter concluded by stating that Mid-Atlantic "is hereby on notice of its material breaches of the [RBAs] and that such agreements shall expire on December 31, 2007 and not be renewed." *Id.*

Despite the disagreement regarding Mid-Atlantic's compliance with the RBAs and the documents flowing between the parties, Mid-Atlantic continued to order Goldwell products from KPSS throughout the summer of 2007. Specifically, between June 13, 2007 and August 16, 2007, Mid-Atlantic ordered over $2.5 million worth of Goldwell products, as evidenced by KPSS invoices to Mid-Atlantic during that time span. Def. Facts ¶ 67; Marino Decl. Exh. V. KPSS provided several notices of arrears throughout this period, and it is undisputed that Mid-Atlantic did not and has not paid for any products ordered after June 13, 2007, although Mid-Atlantic asserts a right of setoff against any amount owing from its purchases. Marino Decl. Exh. OO; Def. Facts ¶ 71; Pl. Resp. 71.

In June 2007, Mid-Atlantic began marketing Rusk hair color products, which were not specifically permitted by the RBAs, and for which KPSS had not given its permission.[14] Def.

---

[14] KPSS had apparently acquiesced to Mid-Atlantic's marketing of Rusk products not involving hair color. Pl. Resp. ¶ 18.

Facts ¶ 18.  While Mid-Atlantic contends that it did not begin doing so until July 23, 2007, *see* Pl. Resp. ¶ 75, its sales reports and Frankel's testimony before this Court establish that Mid-Atlantic began selling non-Goldwell hair color products, including Rusk products, in June 2007, "right after they told us . . . that they were not going to renew us."  Marino Decl. Exhs. Y at 44:5-8; X.

As noted by KPSS letters providing Mid-Atlantic with notice of default, during the summer of June 2007 and continuing into autumn, Mid-Atlantic began reducing its sales and training forces, restricting education for Goldwell products, and attempting to convince salon customers to switch to alternative hair color products.  By October 2007, Frankel admitted that it would no longer comply with the RBAs, as it was Mid-Atlantic's position that KPSS had breached the agreements in June 2007 by providing notice of its intent not to renew or at the very latest, began operating under alternative distributorship agreements with BSG and DePasquale on October 1, 2007.  Marino Decl. Exh. E 101:23-102:6.  Despite this, it is undisputed that Mid-Atlantic continued to use the Goldwell name in its business and on its signs through at least mid-November 2007.  Marino Decl. Exhs. E at 49:25-53:1; F. at 203:2-203:25.  Additionally, Mid-Atlantic continued to sell Goldwell products through at least mid-February 2008, and perhaps as late as March 2008.  Marino Decl. Exhs. E at 40:16-1:18; H at 29:18-30:17.

### D.  Procedural History

Mid-Atlantic filed a complaint against KPSS in this Court on August 14, 2007 [D.E. # 1], to which KPSS answered and counterclaimed on September 19, 2007 [D.E. # 3].[15]  Mid-Atlantic thereafter amended the complaint on December 6, 2007 [D.E. # 16], and KPSS amended its answer and counterclaim [D.E. # 17].

---

[15] The Court denied KPSS's application for temporary restraints on September 21, 2007 [D.E. # 12] (docketed 9/25/07).

The five-count amended complaint alleges the following causes of action:  (1) wrongful termination under the NJFPA; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of contract; (4) tortious interference with contractual relations with respect to established relationships with customers; and (5) tortious interference with contractual relation with respect to established relationship with staff.  Am. Compl. ¶¶ 36-70.  KPSS's amended counterclaim asserts ten causes of action, six of which alleges breach of contract for:  (1) failure to meet minimum sales requirements; (2) failure to use best efforts to promote Goldwell; (3) failure to meet minimum staff requirements; (4) diversion of KPSS's business; (5) failure to pay; and (6) failure to return goods under the RBAs' buy-back provision.  Am. Counterclaim ¶¶ 45-65, 86-90.  The amended counterclaim further asserts causes of action for: (7) tortious interference with business relations; (8) trademark infringement; (9) replevin; and (10) conversion.  *Id.* ¶¶ 66-85, 91-105.[16]

On February 11, 2008, the Court granted KPSS's motion for a preliminary injunction against Mid-Atlantic, requiring it to cease using the Goldwell marks and selling Goldwell products, refrain from holding itself out as a Goldwell distributor, and to return any unsold inventory at the purchase price paid [D.E. 34].  Mid-Atlantic appealed [D.E. # 35] the preliminary injunction, and moved for a stay of the same pending resolution of the appeal [D.E. # 38], which the Court denied [D.E. # 51].  Mid-Atlantic later withdrew its appeal [D.E. # 71].

On August 22, 2008, the parties cross-moved for summary judgment [D.E. # 85, 86].

## IV.   STANDARD OF REVIEW

Summary judgment may be granted under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits

---

[16] The numbering here does not correspond to the counts listed in the amended counterclaim [D.E. # 17].

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must "view the facts in the light most favorable to the non-moving party and [must] draw all inferences in that party's favor." *Gray v. York Newspapers*, 957 F.2d 1070, 1080 (3d Cir. 1992). Summary judgment is improper if there is evidence sufficient to allow a reasonable jury to return a verdict for the non-moving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), or if the factual dispute is one which might affect the outcome of the suit under the governing law . . . ." Id. The movant's burden, however, "may be discharged by 'showing' . . . that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Additionally, the non-movant "may not rest upon mere allegations or denials of the . . . pleading"; instead, the non-movant, "by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Where, as here, the parties have cross-moved against each other for summary judgment, the Court "construes facts and draws inferences 'in favor of the party against whom the motion under consideration is made.'" *Pichler v. Unite*, 542 F.3d 380, 386 (3d Cir. 2008) (quoting *Samuelson v. LaPorte Cmty. Sch.*, 526 F.3d 1046, 1051 (7th Cir. 2008)). The Court "must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance" with the foregoing standards. *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 Fed. App'x 266, 270 (3d Cir. 2006) (citing *Schlegel v. Life Ins. Co. of N. Am.*, 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003)). Because the parties incorporate various arguments throughout each of their three respective briefs, the Court will do so as well where appropriate.

## V.   DISCUSSION

KPSS moves for summary judgment both offensively and defensively;  it argues: (1) that it should be awarded summary judgment with respect to Mid-Atlantic's amended complaint (i.e., that the amended complaint must be dismissed in its entirety); and (2) that it is entitled to summary judgment on three of its own breach of contract claims and its trademark infringement claim as well.  Mid-Atlantic moves for summary judgment on its claim under the NJFPA; its motion does not address its other asserted causes of action.

### A.  KPSS's Motion

1. <u>Partial Summary Judgment is Appropriate With Respect to Mid-Atlantic's Amended Complaint</u>

KPSS first argues that the Court should render summary judgment with respect to each of the five counts in Mid-Atlantic's amended complaint.  Because Mid-Atlantic does not oppose dismissal of the fourth and fifth counts of the amended complaint (for tortious interference of business relations), *see* Pl. Opp. Br. at 14, the Court will dismiss those counts at the outset, and thus addresses only Mid-Atlantic's first three causes of action.

### a.  NJFPA

The New Jersey Legislature enacted the NJFPA in 1971 to provide recompense to franchisees when their franchisor-counterparts capitalize on superior economic and bargaining positions.  As the New Jersey Supreme Court expressed the problem in *Westfield Centre Service, Inc. v. Cities Service Oil Co.*, 86 N.J. 453, 461-62 (1981):

> Though economic advantages to both parties exist in the franchise relationship, disparity in the bargaining power of the parties has led to some unconscionable provisions in the agreements. Franchisors have drafted contracts permitting them to terminate or to refuse renewal of franchises at will or for a wide variety of reasons including failure to comply with unreasonable conditions. Some franchisors have terminated or refused to renew viable

24

> franchises, leaving franchisees with nothing in return for their investment. Others have threatened franchisees with termination to coerce them to stay open at unreasonable hours, purchase supplies only from the franchisor and at excessive rates or unduly expand their facilities.

The NJFPA curbs such abuse by implementing the following pertinent proscriptions:

> It shall be a violation of this act for any franchisor directly or indirectly through any officer, agent, or employee to terminate, cancel, or fail to renew a franchise without having first given written notice setting forth all the reasons for such termination, cancellation, or intent not to renew to the franchisee at least 60 days in advance of such termination, cancellation, or failure to renew . . . .  It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise. . . . It shall be a defense for a franchisor, to any action brought under this act by a franchisee, if it be shown that said franchisee has failed to substantially comply with requirements imposed by the franchise and other agreements ancillary or collateral thereto.

N.J.S.A. §§ 56:10-5; 56:10-9.

Before discussing the merits of Mid-Atlantic's NJFPA claim, the Court notes two aspects of the NJFPA that are either not in play here or warrant only fleeting attention.  First, KPSS does not argue in its moving brief (though it half-heartedly asserts in its defensive brief) that the RBAs do not create franchises under the NJFPA.  The statute defines a franchise as:

> [A] written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J.S.A. § 56:10-3(a).  The RBAs are, without question, written arrangements permitting Mid-Atlantic to utilize the Goldwell brand name in its distribution business.  Drawing all reasonable inferences in Mid-Atlantic's favor, the RBAs also establish a community of interest between the

parties:  the agreements reflect the "symbiotic character of a true franchise arrangement and the consequent vulnerability of [Mid-Atlantic] to an unconscionable loss of [its] tangible and intangible equities."  *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 341 (1992) (hereinafter "*ISI I*") (quoting *Neptune T.V. & Appliance Serv., Inc. v. Litton Microwave Cooking Prods. Div.*, 190 N.J. Super. 153, 165 (App. Div. 1983).  The Court finds little merit in KPSS's argument to the contrary.  *See* Def. Opp. Br. at 10-12.

Second, Mid-Atlantic does not argue that KPSS failed to provide timely written notice of its intent not to renew the RBAs; it is undisputed that KPSS provided both the initial and supplemental written notices of non-renewal well before the sixty-day deadline to provide such notice.

Moving forward, KPSS makes three central arguments in support of its motion for summary judgment as to the NJFPA claim.  First, it argues that the NJFPA does not apply to the North Carolina and Multi-State RBAs because they do not concern specific transactions within New Jersey.  Def. Br. at 14-15.  Second, it argues that Mid-Atlantic's failure to "substantially comply" with the RBAs in various respects provided it "good cause" to not renew the New Jersey RBA (as well as the other RBAs, should the Court not credit its first argument).  Third, it argues that it did not "terminate, cancel, or fail to renew" the RBAs by providing notice of its *intent* not to renew, and consequently Mid-Atlantic's pre-expiration repudiation of the RBAs agreements absolved it of NJFPA liability.  The Court discusses each contention in turn.

### i.   Application of NJFPA to Out-of-State RBAs

Relevant here, N.J.S.A. § 56:10-4 specifically states that the NJFPA "applies only . . . to a franchise . . . the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey . . . ."  N.J.S.A. § 56:10-4(a).  The

statute defines "place of business" as a "fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services.  Place of business shall not mean an office, a warehouse, a place of storage, a residence or a vehicle."  N.J.S.A. § 56:10-3(f).  Because the North Carolina and Multi-State RBAs neither contemplate nor require such a place of business in New Jersey, KPSS argues that the act has no applicability to those agreements.  Def. Br. at 15.  Further, because the North Carolina and Multi-State RBAs expressly state that they "shall not affect the separate and independent" character of the New Jersey RBA or each other, the agreements must be analyzed independently of each other, thus removing the North Carolina and Multi-State RBAs from the purview of the NJFPA.  *Id.* at 14-15.

Mid-Atlantic argues that the NJFPA may be applied extra-territorially, and that in practice, the parties understood and treated the RBAs as one omnibus franchise agreement, thus subjecting the out-of-state RBAs to the NJFPA.  Mid-Atlantic correctly states that the New Jersey Supreme Court has approved of extra-territorial application of the NJFPA in some circumstances.  *See ISI I*, 130 N.J. at 366-71.  In *ISI I*, the New Jersey Supreme Court considered whether the NJFPA could be applied to non-New Jersey activities of a single, New Jersey-based franchise agreement.  *Id.* at 366.  As it considered the legislative history of the NJFPA, it asked: "would the Legislature have intended to protect a New Jersey businessperson who had invested substantial assets in a New Jersey-based hub of a multi-state franchise operation?"  *Id.* at 367.  It answered:  "To the extent that it is applicable, the New Jersey Act regulates instate conduct that has out-of-state effects. . . .  [T]he [NJFPA] is applicable only to specific transactions affecting New Jersey, *i.e.*, franchises that have a 'place of business' in New Jersey."  *Id.*  In holding that the NJFPA could be applied to out-of-state operations of a New Jersey franchise agreement, the

court's analysis was limited to a single franchise agreement.  It did not consider under which circumstances independent non-New Jersey franchise agreements would implicate the NJFPA simply by virtue of the same parties' execution of an additional New Jersey franchise agreement.

Unlike *ISI I*, the parties here executed three contracts which stated that they were to be viewed as separate transactions, and only one required Mid-Atlantic to establish a place of business in this state.   The Court agrees with KPSS that the Third Circuit's analysis in *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825 (3d. Cir. 1994) (hereinafter, "*ISI II*) suggests that multiple franchise agreements executed by the same parties, some of which envision New Jersey activities and some do not, are not necessarily all governed by the NJFPA.  In discussing the constitutionality of extra-territorial application of the NJFPA, the Third Circuit emphasized:

> This is not to say that New Jersey would have a right to apply the NJFPA to any franchise agreement in the country, as long as suit is brought in New Jersey. . . . In this case the record is clear that it was the parties, not New Jersey, who contemplated that the franchisee maintain a place of business in New Jersey. And it was the parties, not New Jersey, who bound themselves to a [single] exclusive multistate distribution agreement. Therefore, it is the parties' own agreement which operated to project the New Jersey law outside of New Jersey's borders . . . .

*Id.*  Here, only the New Jersey RBA requires a place of business in this state.  Unlike *ISI II*, the parties here formulated a multistate distributorship relationship through multiple, independent contracts, and not under one agreement.   As a result, the parties' agreements themselves expressly did not "project the New Jersey law outside of New Jersey's borders."  *Id.*

Mid-Atlantic's has a fall-back position, however.   It argues that the parties' post-execution course of conduct was such that in reality, one unified multi-state distributorship agreement existed.   In support, it points to its practice of placing aggregated, cross-territorial

orders, which KPSS subsequently filled by shipping all ordered products to Mid-Atlantic's New Jersey warehouse and distribution processing center.  Pl. Opp. Br. at 4.  In further support of its unified franchise argument, Mid-Atlantic argues that when it reported its monthly sales figures to KPSS, "the numbers were reported as the sum for all the territories."  *Id*.  KPSS disputes this by pointing to the fact that Mid-Atlantic actually produced territory-specific reports in 2003 and 2004 before aggregating the numbers thereafter.  Further, KPSS argues that it repeatedly requested Mid-Atlantic to submit territory-specific reports.  Marino Decl. Exh. F. at 37:9-22.

KPSS admits that Mid-Atlantic aggregated its orders and that all Goldwell products that Mid-Atlantic purchased were processed through New Jersey, but it denies that any unified course of conduct had been established by that practice, and rests its argument largely on the RBAs' terms.  It also argues that the fact that Mid-Atlantic maintained three separate sales managers and education staffs for the three territories conclusively proves that even Mid-Atlantic regarded the RBAs as distinct. Def. Rep. Br. at 4.

Boilerplate terms aside, the evidence about the parties' course of conduct is sufficiently in dispute such that the Court cannot call the issue at this point.  While KPSS has adduced evidence suggesting that it never accepted Mid-Atlantic's attempt to unify the agreements, Mid-Atlantic has presented contrasting evidence that KPSS's conduct with respect to filling orders, making shipments, calculating shipments, etc., suggested a single *de facto* agreement.  The significance of these proofs will be more evident after a trial.

The Court re-answers in the affirmative the question raised in *ISI I:*  the New Jersey Legislature likely would have intended the NJFPA to apply to franchises which disclaimed connection to New Jersey franchises in the contract, but where the parties nevertheless acted as if the multiple franchises constituted one umbrella agreement. This Court declines to rule as a

matter of law on the RBAs' independence provisions when a reasonable observer could conclude that the parties disregarded them in fact. Because the New Jersey RBA required Mid-Atlantic to establish a place of business in this state and the evidence heretofore adduced permits the inference that a single multi-state agreement existed, the Court will not grant KPSS's motion as to NJFPA applicability to the non-New Jersey RBAs.

<em>ii. Good Cause</em>

As stated above, the NJFPA does not prohibit all failures to renew a franchise agreement; the statute permits a franchisor to forego renewal when it has "good cause" to do so. N.J.S.A. §§ 56:10-5; 56:10-9. Good cause is defined under the act as a franchisee's failure to "substantially comply with those requirements imposed upon him by the franchise." *Id.* The parties agree that "'[s]ubstantial compliance' is surely something less than absolute adherence to every nuanced term of an agreement, but [it]—at a minimum—requires that the franchisee refrain from acting in direct defiance of a term of the [a]greement." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 91 F. Supp. 2d 733, 740 (D.N.J. 2000) (hereinafter "*GMC I*"); Def. Br. at 15; Pl. Br. at 29. . The parties agree that the concept of "substantial compliance" is simply the absence of a "material breach" of contract. *See Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 317 n.8 (3d Cir. 2001) (hereinafter "*GMC II*"); Def. Br. at 16; Pl. Br. at 29. To determine whether KPSS had good cause to not renew the RBAs, therefore, the Court must analyze whether Mid-Atlantic first materially breached their terms.

KPSS argues that Mid-Atlantic materially breached the RBAs due to the following, as stated in the initial and supplemental notices of intent not to renew: (1) failure to meet its 2006 sales quotas; (2) marketing unauthorized non-Goldwell products; (3) failure to use best efforts; (4) failure to timely pay all invoices; and (5) failure to meet/maintain minimum staffing and

30

education requirements.  Def. Br. at 16-17.  Without disputing the factual accuracy of these alleged breaches, Mid-Atlantic argues that "most of these reasons are not applicable because they arose <u>after</u> KPSS repudiated [i.e., provided notice of intent not to renew in July 2007] the Agreements and <u>after</u> Mid-Atlantic was relieved of its obligations under the Agreements."  Pl. Opp. Br. at 5 (underline in original).  In other words, Mid-Atlantic asserts that the only potential predicate for good cause is its alleged failure to meet its minimum sales requirements in 2006.  *See* Pl. Opp. Br. at 5-6.  The Court agrees that the initial notice of intent not to renew can only be legitimated by good cause based on the alleged failure to meet the 2006 sales quotas.

The parties do not materially dispute the actual sales revenues that Mid-Atlantic generated in 2006.  At this juncture, the Court will use the numbers provided by Mid-Atlantic, which were as follows:

| | |
|---|---|
| New Jersey: | $6,634,170.20 |
| Multi-State: | $4,255,414,01 |
| North Carolina: | $2,891,743.68 |

Frankel Aff.¶ 49; Reino Decl. Exh. G.  Mid-Atlantic argues that these raw numbers do not actually reflect the "Net Sales" as required by the RBAs because they do not account for KPSS discounts and giveaways that Mid-Atlantic provided to its salon customers.  Mid-Atlantic argues that these discounts must be added back to the raw sales to arrive at "Net Sales" as defined under the RBAs.  As the Court stated while recounting the facts, the RBAs define "Net" as "gross sales or gross discounts, as the case may be, *calculated net of all promotional discounts* and/or products returns."  NJ RBA at 20.  The parties further "agreed for purposes [of the RBAs] that the term 'promotional discounts' as applied to sales (not purchases) shall not include the following discounts that [KPSS] (at its discretion) currently offers:  Business Development Fund

("BDF") credits, chain sales credits, school discount credits, and Goldwell Salon Alliance ("GSA") rewards credits [(the "excluded discounts)]." *Id.* Thus, Mid-Atlantic argues that because it only reported to KPSS the raw sales numbers that did not take into account the excluded discounts that do not get netted against gross sales, the Court must add back the following excluded discounts to arrive at Net Sales:

| | |
|---|---|
| New Jersey: | $784,441.00 |
| North Carolina: | $123,955.00 |
| Multi-State: | $536,618.00 |

Pl. Br. at 29.  By all accounts, if these numbers are added back to the gross sales numbers that Mid-Atlantic reported, then Mid-Atlantic satisfied its 2006 quotas for all territories.[17]

An issue regarding interpretation of a contract clause "presents a purely legal question that is suitable for decision on a motion for summary judgment." *Spaulding Composites Co. v. Aetna Cas. & Sur. Co.,* 176 N.J. 25 (2003); *Driscoll Constr. Co. v. State,* 371 N.J. Super. 304, 313-314 (App. Div. 2004).  Summary judgment as to the meaning of a contract is improper, however, where the term's meaning is not clear or is reasonably susceptible to more than one interpretation.  *See Journal Pub. Co. v. American Home Assurance Co.,* 740 F. Supp. 1015, 1022 (D.N.J. 1990) (quoting *Record Club of America, Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1270 (2d Cir. 1989)); *see also Hedges v. Board of Educ. of the Manchester High Sch. Dist.,* 399 N.J. Super. 279, 291 (Law Div. 2007) (citing *Great Atl. & Pac. Tea Co. v. Checchio,* 335 N.J. Super. 495, 502 (App. Div. 2000)).

The phrase "calculated net of all promotional discounts" is ambiguous, thus rendering the proper calculation of Mid-Atlantic's 2006 "Net Sales" inappropriate for summary judgment.

---

[17] The discount-by-discount breakdown which Mid-Atlantic urges appears in the Frankel Affidavit at ¶¶ 43-59.

The phrase does not make clear whether gross sales, when netted against the promotional discounts, are increased or decreased. Because excluded discounts are expressly not promotional discounts to be netted against gross sales, the ambiguity makes it is unclear whether they should be added back to gross sales or appropriately excluded from the net sales calculation.

Unsurprisingly, KPSS argues that it makes no sense for Mid-Atlantic to hamstring itself by reporting lower numbers than the RBAs required it to (i.e., without the discounts included). Def. Opp. Br. at 21. But KPSS overlooks the possibility that the sales figures, which both sides generated from raw sales reports submitted to KPSS, did not automatically factor in the excluded discounts at the time of sale. Mid-Atlantic's explanation—that the reports would do not reflect discounts given to customers because they merely show the price for which each product was sold—holds water on summary judgment. The logic behind adding back the excluded discounts also weighs in favor of Mid-Atlantic. The discounts are tools to generate goodwill from loyal Goldwell customers, thereby benefitting KPSS, yet reduce Mid-Atlantic's gross sales. KPSS's proposed calculation method would thus tend to decrease Mid-Atlantic's gross revenues (because it would not take in the value of the discount) and at the same time hamper its ability to meet its sales quotas. The Court is unpersuaded that KPSS prevails on its argument based upon Mid-Atlantic's failure to account for the discounts on its tax returns and financial reports, because the discounts do not affect the revenues which Mid-Atlantic actually generated. Finally, KPSS argues that Mid-Atlantic's argument would permit a net figure to be greater than a gross figure, contrary to the common understanding of the terms. Def. Opp. Br. at 21. The Court rejects this argument as well, and  agrees with Mid-Atlantic that the parties were free to alter the common understandings of "net" and "gross" to account for Mid-Atlantic's decreased revenues as a result of the discounts and giveaways attendant with its operations.

The calculation method prescribed by the RBAs is reasonably susceptible to two different interpretations, making it impossible to conclude as a matter of law that Mid-Atlantic breached its 2006 minimum sales obligations.  Because the Court cannot determine whether Mid-Atlantic breached its obligations in the first instance (let alone *materially* breached), it follows that summary judgment is improper with respect to whether KPSS had good cause to provide the July 2007 notice of intent not to renew the RBAs.[18]  As the Court has noted, all of Mid-Atlantic's other asserted material breaches of occurred contemporaneous with or subsequent to KPSS's July 2007 notice.  Because good cause cannot be found as to the RBAs 2006 minimum sales requirements alone, it necessarily follows that a genuine issue of material fact exists as to whether good cause existed as of June 13, 2007.

That does not end the matter, however; the Court will next discuss whether Mid-Atlantic's post-notice conduct provided supplemental good cause to permit the RBAs to expire without renewal.

### iii.  Notice of Intent Not to Renew

Having found that there exists a genuine issue of material fact with respect to good cause as of June 13, 2007, the Court must also analyze whether:  (1) Mid-Atlantic's notice of its intent not to renew the RBAs (either the June 13, 2007 oral notice, or the July 13, 2007 written notice) itself is a violation of the NJFPA; and (2) if the answer to the first question is yes, whether Mid-Atlantic's post-violation conduct absolves KPSS of NJFPA liability.  For the following reasons,

---

[18] While an inquiry into whether Mid-Atlantic's breach (if so found) was material is unnecessary at this time given the RBAs' ambiguity, the Court notes that it would be highly unlikely to find as a matter of law that such trifling failures were material.  The court will leave it to the trier of fact to determine, should it find a breach in the first instance, whether the same rises to the level of material, under the terms of the RBAs or otherwise.  *See Amerada Hess Corp. v. Quinn*, 143 *N.J. Super.* 237, 251 (Law Div. 1976).

the Court finds that the record evidence is insufficient to permit an answer as a matter of law, and thus will deny the motion.

This dispute depends upon whether the initial adverse action (the notice of non-renewal) constitutes an anticipatory repudiation of the RBAs.  In this case, Mid-Atlantic asserts that when KPSS provided notice to Mid-Atlantic that it would not renew the RBAs, it anticipatorily violated the NJFPA by signaling a definite and unconditional intention not to renew the agreements.[19]  In essence, Mid-Atlantic argues that a franchisor's notice of intent not to renew, when given without good cause, constitutes an NJFPA violation at the time of the notice, thus relieving it of its obligations under the agreements

KPSS argues that it literally did not violate the act by providing the notice because it did not "terminate, cancel, or fail to renew" the RBAs, but only signaled its *intent* to permit the RBAs to expire on their own terms.  N.J.S.A. § 56:10-5.  Because, it asserts, there was no violation by providing the notice itself, Mid-Atlantic's subsequent failure to maintain the minimum personnel, to conduct the required Goldwell education classes, to refrain from selling competitors' products, etc., provided KPSS with additional good cause, which it documented in its supplemental non-renewal notice.  Furthermore, it argues that even assuming that the notice constituted an anticipatory violation of the NJFPA, Mid-Atlantic improperly continued to absorb the benefits of the RBAs, yet failed to respond to its corresponding obligations.

The posture of this case presents the Court with a unique question:  does an NJFPA claim lie where a franchisor declares unequivocally its intent not to renew a franchise agreement and the franchisee then treats the notice as a repudiation because it believes the franchisor lacks good

---

[19] Mid-Atlantic couches its argument in terms of the breach of an implied obligation to renew, citing *Shell Oil Co. v. Marinello*, 120 N.J. Super. 357 (Ch. Div. 1972).  The better understanding, however, is one that permits a claim for nonrenewal at the point the franchisor unconditionally provides notice of non-renewal, and then actually fails to renew the franchise.

cause?  KPSS argues that because the written notices that it provided to Mid-Atlantic expressly stated that KPSS would continue to comply with the RBAs until they expired, Mid-Atlantic continued to be bound thereby as well.  This view, however, gives insufficient attention to the goals which the NJFPA seeks to achieve.  Where franchisors are in a superior bargaining position, an unequivocal notice of intent not to renew is no different from the actual failure to renew that is bound to follow.  Arguably, the franchisee is placed in a worse position where, as here, it is faced with a Hobson's choice of courting other manufacturers with which to do business (but which runs the risk of violating the extant-but-soon-to-expire agreement), or of continuing to abide by the agreement at the expense of losing its substantial investment when the un-renewed agreement expires.

The Court is unprepared to find that a franchisee remains exclusively wedded to a franchisor when the latter provides a notice of intent to allow the franchise agreement to expire on its own terms without good cause.  Doing so would contravene the clear purpose of the NJFPA to protect franchisees who have invested substantial capital in furthering a franchise.  On these facts, the Court concludes that a claim under the NJFPA will lie where a franchisor provides unequivocal notice of is intent not to renew the franchise, and the franchisee treats such a notice as a repudiation.  *Cf. Westfield Centre Service, Inc. v. Cities Serv. Oil Co.*, 158 N.J. Super. 455, 469 (Ch. Div. 1978) (finding violation of NJFPA in part because franchisor provided notice of intent to terminate irrespective of franchisee's future viability).

KPSS argues that even if an anticipatory repudiation theory lies under the NJFPA, the record definitively shows that Mid-Atlantic in fact did not treat the RBAs as terminated because it continued to take advantage of the RBAs where it was to Mid-Atlantic's benefit.  KPSS asserts that Mid-Atlantic may not treat the RBAs as terminated for purposes of avoiding its own

obligations on the one hand, yet simultaneously continue to reap the benefits of the agreements by treating them as extant on the other.  Thus, even if KPSS's notice of intent not to renew did constitute an anticipatory repudiation, it argues that Mid-Atlantic's own conduct precludes it from relying on that repudiation.  It is undisputed that after KPSS provided Mid-Atlantic oral notice of its intent not to renew the RBAs on June 13, 2007, Mid-Atlantic assured KPSS that it would fulfill its obligations under the RBAs, and then continued to order Goldwell products from KPSS for purposes of resale (including more than $300,000 worth of Goldwell products the same day it commenced this action).  Mid-Atlantic continued to sell Goldwell products *even after the RBAs had expired*, well into 2008, yet now argues that it had treated the contracts as terminated as a result of KPSS's June 13, 2007 oral notice of non-renewal.  Relying on "basic contract principles," the Third Circuit has admonished non-breaching parties that they may not treat repudiated contracts as terminated and alive as they see fit:

> [W]hen one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits.

*Pappan Enters. v. Hardee's Food Sys.*, 143 F.3d 800, 806 (3d Cir. 1998) (quoting *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992); *Ramada Franchise Sys. v. Eagle Hospitality Group*, No. 03-3585, 2005 U.S. Dist. LEXIS 45102, at *28 (D.N.J. June 24, 2005).

Mid-Atlantic responds to these cases with the following argument:  they "do[] not stand for the proposition that a non-breaching party loses its breach of contract claims if it stops performance of its obligations under the contract before notifying the repudiating party that it has elected its right to avoid performance of the contract."  Pl. Rep. Br. at 11.  Further, Mid-Atlantic

argues that no "party is under any obligation to perform under a contract once the repudiating party announces that it will not honor the remainder of the contract." *Id.* at 10.

Assuming that KPSS repudiated the RBAs, Mid-Atlantic was indeed under no obligation to continue to perform under them. Once it determined that it would continue to benefit therefrom, however, it was not permitted to forsake its obligations thereunder. In *S&R*, the Third Circuit reversed the district court's denial of a franchisor's application to preliminarily enjoin a terminated franchisee's continued use of the franchisor's marks when it discontinued paying royalty fees to the franchisor. *S&R*, 968 F.2d at 373, 379. Quoting *Burger King v. Austin,* Bus. Fran. Guide (CCH) para. 9788 at 22,069 (S.D. Fla. Dec. 26, 1990), the Third Circuit stated the following:

> Although Defendants may prevail on their breach of contract claims, thus excusing them from paying the amounts currently due and perhaps entitling them to further damages, the Court cannot see how this separate cause of action entitles them to continued rights under the franchise agreement. *In order to have preserved their right to recover for the alleged breaches and to continue to use the [Plaintiff's] trademark, Defendants should have continued to pay royalties, advertising expenses and rent.*

*S&R*, 968 F.2d at 376 (quoting *Burger King*) (emphasis in *S&R*). Under that analysis, Mid-Atlantic could not continue to obtain the benefits of its bargain upon a perceived repudiation, discontinue performance, and then retroactively argue that it in fact treated the repudiated contract as terminated.

That being said, the discussion in *S&R*, *Burger King*, and *Pappan* was about whether an injunction should issue as a result of a franchisee's continued trademark use without paying royalties. The Third Circuit in *S&R* concluded its discussion by stating the following:

> In sum, [plaintiff] has done exactly what contract law forbids. Feeling that [defendant] had violated its duty to him, [plaintiff] stopped making royalty payments, but he continued to operate the

> service centers under the [defendant's] name. . . .  [Plaintiff] did
> not pay royalties after early 1989; [defendant] gave [plaintiff] 60
> days to cure the default, and when [plaintiff] did not respond the
> franchises were terminated. . . .   [Plaintiff] still may have a
> legitimate claim for damages, but he does not have the right to
> continue using the trademark as an infringer.

*S&R*, 968 F.2d at 377. The Court agrees that Mid-Atlantic has not lost its claim under the NJFPA

as a result of failing to uphold its obligations under the RBAs; rather, the parties' competing

theories of breach concern the remedies (i.e., extent of damages) flowing from the facts as the

jury will find them in this case.  *See McDonald's Corp. v. Robert A. Makin, Inc.*, 653 F. Supp.

401, 403 (W.D.N.Y. 1986) (stating that the defendants' counterclaims will be adjudicated in their

own right, but the "alleged wrongs of plaintiff do not constitute affirmative defenses to

defendants' non-payment of franchise fees").   Absolving KPSS of potential NJFPA liability

because of an unlawful response to the repudiation would be contrary to the purposes of the

NJFPA.  Given the dependent nature of liability based on the material issues of fact the Court has

discussed, summary judgment under the NJFPA is inappropriate.

### b.  Breach of Good Faith and Fair Dealing

Unlike New Jersey, an independent cause of action for a breach of the implied duty of

good faith and fair dealing is not cognizable under Maryland law.  *Compare Marland v. Safeway,*

*Inc.*, 65 Fed. App'x 442, 449 (4th Cir. 2003) (citing relevant case law and stating that "[w]e

agree with the weight of this authority that no independent cause of action of this type is

recognized in Maryland") *with Barrows v. Chase Manhattan Mortgage Corp.*, 465 F. Supp. 2d

347, 365 (D.N.J. 2006) (independent cause of action for breach of duty of good faith and fair

dealing is recognized by New Jersey law).  Mid-Atlantic agrees that its second cause of action

rises or falls depending on which state's law applies.  Pl. Opp. Br. at 7.

Courts in this state give "effect to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy." *GMC II*, 263 F.3d at 331 n.21 (citing *ISI I*, 130 N.J. at 341); *see also Stadium Chrysler Jeep, L.L.C. v. DaimlerChrysler Motors Co.*, 324 F. Supp. 2d 587, 594 n.1 (D.N.J. 2004).

In both *General Motors* and *Stadium Chrysler Jeep*, plaintiff asserted, *inter alia*, claims arising under the NJFPA and the common law duty of good faith and fair dealing. In both cases, the parties' agreements stated expressly that Michigan law would apply. In both actions the courts, while applying NJFPA principles to the plaintiffs' claims under the statute, found no violation of New Jersey's public policy insofar as the contractual choice of law provision bound the parties to Michigan's common law good faith and fair dealing principles. *See GMC II*, 263 F.3d at 331 n.21; *Stadium Chrysler Jeep*, 324 F. Supp. 2d at 594 n.1. This Court follows a similar course; it discerns no fundamental policy disagreement between Maryland and New Jersey in this arena, and will thus apply Maryland law as stipulated by the RBAs. Both states command parties to a contract to operate within the confines of good faith and fair dealing; that only one state provides an independent remedy for the breach of that duty does not corrupt New Jersey's fundamental public policy. Indeed, in *Stadium Chrysler Jeep*, the court determined that under Michigan law and the circumstances presented, the duty of good faith and fair dealing did not apply at all. 324 F. Supp 2d at 601. *A fortiori*, no New Jersey public policy violation inheres when Maryland law is applied in this case.

In arguing otherwise, Mid-Atlantic cites *ISI I* and *King v. GNC Franchising, Inc.*, No. 04-5125, 2007 U.S. Dist. LEXIS 37547, at *5 n.1 (D.N.J. May 23, 2007). In *ISI I*, however, the Court was asked to decide whether the application of the *NJFPA* applied despite the existence of a California choice of law provision (the New Jersey Supreme Court answered affirmatively).

*ISI I*, 130 N.J. at 341.  It did not answer the different question of whether an extra-state choice of law provision may apply to non-NJFPA (i.e., common law) claims asserted elsewhere in the litigation.  Nor did *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.,* 208 N.J. Super. 666, 671-72 (App. Div. 1986)—relied upon by the courts in both *ISI I* and *King*—where the issue presented was whether the NJFPA or a Connecticut analogue applied to a Connecticut franchisee notwithstanding a New Jersey forum selection clause (the court held the Connecticut law applied based on the franchisee's principal place of business).  *Id.* at 671-79.  Again, the sole inquiry was which state's franchise protection statute applied, not whether a choice of law provision otherwise governed existing common law claims.

This Court recognizes that the court in *King* applied New Jersey law to breach of contract counterclaims brought by a defendant franchisor against New Jersey franchisees despite a Pennsylvania forum selection clause (the court had previously granted summary judgment on the franchisees' affirmative NJFPA and common law claims, *see King v. GNC Franchising, Inc.*, No. 04-5125, 2006 U.S. Dist. LEXIS 76986 (D.N.J. Oct. 23, 2006)).  However, insofar as *King* relies on *ISI I* and *Winer* for the proposition that, despite an alternative forum selection clause, "New Jersey choice of law jurisprudence clearly holds that the law of the state in which the franchisee has its principal place of business should apply" inexorably in all respects to all causes of action, this Court must politely part company with that decision.  *King*, 2007 U.S. Dist. LEXIS 37547, at *5 n.1; *see also Harter Equip., Inc. v. Volvo Constr. Equip. N. Am., Inc.*, No. 01-4040 2003 U.S. Dist. LEXIS 27210, at *8-16, 21-24 (D.N.J. Sept. 23, 2003) (in an action commenced by franchisee with a principle place of business in New Jersey, applying NJFPA principles to NJFPA claim and applying Illinois contract principles to common law claims).

Under the circumstances, the Court will respect the RBAs' choice of law provisions stipulating that Maryland law shall govern Mid-Atlantic's non-NJFPA claims.   As plaintiff concedes that summary judgment as to Count Two is appropriate under Maryland law, the Court will enter such a judgment.[20]

### c.  Breach of Contract

To recover on a breach of contract claim in Maryland, a plaintiff must establish that the defendant owed a contractual obligation to the plaintiff and that defendant breached that obligation.  *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001).  KPSS argues that Mid-Atlantic cannot establish that KPSS breached any contractual duty because:  (1) it continued to fulfill its obligations under the RBAs after it provided a notice of non-renewal to Mid-Atlantic; (2) only upon learning that Mid-Atlantic began openly defying the RBAs in October 2007 did it cease so performing; and (3) the RBAs expressly vested in KPSS the sole and absolute discretion to renew the RBAs or allow them to expire.  Def. Br. at 19-20.

Mid-Atlantic reiterates in a single paragraph its argument that "the New Jersey Legislature has, through the [NJFPA], written into every franchise agreement an implied covenant of renewal so long as the franchisee has substantially complied with his obligations to the franchisor," thus precluding summary judgment.  Pl. Opp. Br. at 9.   It cites *Shell Oil Co. v. Marinello*, 120 N.J. Super. 357 (Ch. Div. 1972) in support.   In *Marinello*, the defendant franchisee had operated under several franchise agreements with the plaintiff for 13 years, after which the plaintiff informed him two months prior to expiration of the then-current agreement that plaintiff would not renew the franchises.  *Marinello*, 120 N.J. Super. at 367.  The court

---

[20] KPSS asserts in the alternative that Mid-Atlantic has not established a triable issue of fact under New Jersey law. Def. Rep. Br. at 7-8.  In light of the Court's finding that Maryland law governs the non-NJFPA claims asserted in the amended complaint, it does not reach KPSS's alternative argument.

ultimately found that the legislature had read into all franchise agreements an implied covenant of renewal. *Id.* at 375. It did so, however, after finding that the franchise in question did not merit protection under the NJFPA because it had been executed before the statute became effective. *Id.* at 368-70.

Here, the NJFPA applies to the RBAs, and thus there is no need to resort to stretching the terms of the agreements to fit the statute's strictures. Mid-Atlantic's position would have the Court inject the NJFPA's renewal requirements into Maryland contract law. Phrased differently, Mid-Atlantic's argument is simply a recapitulation of its NJFPA claim. But Mid-Atlantic cannot bootstrap its NJFPA cause of action onto its distinct breach of contract claim; the two are separate causes of action accompanied by separate requirements. A franchisor can in all respects comply with the terms of a franchise agreement, yet violate the NJFPA when it permits a franchise agreement to expire without good cause; conversely, a franchisor can subscribe to the NJFPA's mandates, but nonetheless breach a franchise agreement. Acceptance of Mid-Atlantic's argument would render every franchisor's violation of the NJFPA for failure to renew—despite compliance with the contract's terms—a *per se* breach of contract. Mid-Atlantic cites no authority for this extraordinary proposition. As the Court can find none either, it rejects as a matter of law Mid-Atlantic's attempt to re-argue its NJFPA claim under the guise of breach of contract.[21]

---

[21] Although, as stated above, Maryland law governs Mid-Atlantic's breach of contract claim, the Court notes that it could find no New Jersey cases in which NJFPA failure-to-renew principles were engrafted onto the breach of contract analysis where the express terms of the franchise agreement were clear and unambiguous, and with which the franchisor otherwise complied. *Cf. Harter Equip.*, 2003 U.S. Dist. LEXIS 27210, at *21-24 (applying common law contract principles without resort to NJFPA issues). Further, as the Court has recognized, "substantial compliance" is the conceptual converse of "material breach." *See GMC II*, 263 at 317 n.8. Thus, it is perfectly conceivable (and probable) that a *termination* or *cancellation* of a franchise agreement without good cause is also a material breach of the agreement. Where, as here, however, an NJFPA claim is premised upon a franchisor's refusal to renew an expired franchise without good cause, the Court rejects the proposition that that failure is necessarily a material breach of contract where the franchisor has otherwise complied with the terms of agreement in all respects.

Sections 3(b) of the New Jersey RBA and 3.2 of the North Carolina and Multi-State RBAs granted KPSS the unconditional discretion to renew or not renew Mid-Atlantic as its regional distributor.[22]  Whether failing to renew Mid-Atlantic violates the NJFPA is an altogether separate matter.  But it is not a breach of contract, and the Court will grant summary judgment and dismiss Count Three of the amended complaint.

### d.  Conclusion

The Court holds that, viewing the facts in the light most favorable to Mid-Atlantic and drawing all reasonable inferences in its favor, KPSS has not established as a matter of law that plaintiff's claim under the NJFPA should be dismissed on summary judgment, and will deny the motion as to Count One of the amended complaint.  It does find, however, that Mid-Atlantic's causes of action for KPSS's alleged breach of the obligation of good faith and fair dealing and breach of contract are unsustainable, and will thus grant KPSS's motion for summary judgment as to Counts Two and Three of the amended complaint.

### 2.  Summary Judgment is Inappropriate With Respect to KPSS's Amended Counterclaim

As the Court has noted, KPSS also moves for summary judgment on four claims asserted in its amended counterclaim.  The Court will review the three breach of contract claims at once, followed by KPSS's claim under the Lanham Act.

### a.  Breach of Contract

KPSS moves for summary judgment on its breach of contract allegations based on the following:  (1) Mid-Atlantic's failure to pay invoices; (2) Mid-Atlantic's alleged failure to

---

[22] The Court notes that N.J.S.A. § 56:10-7(f) makes it a violation of the NJFPA to "provide any term or condition in any lease or other agreement ancillary or collateral to a franchise, which term or condition directly or indirectly violates" the statute.  The Court need not further discuss whether the provision granting full discretion to KPSS to renew or not renew Mid-Atlantic as a distributor is a violation of § 56:10-7, because Mid-Atlantic has not raised the issue.

maintain the minimum staffing requirements under the RBAs; and (3) Mid-Atlantic's alleged diversion of KPSS's business.  Each is denied.

### i.    Setoff/Recoupment

Mid-Atlantic concedes that it has not paid KPSS for a substantial amount of Goldwell products that it ordered after the alleged repudiation.  It argues, however, that it has asserted the affirmative defense of setoff, which would eliminate or reduce KPSS's entitlement to damages if Mid-Atlantic wins on its NJFPA claim.  The parties also dispute exactly how much Mid-Atlantic currently owes KPSS on the products that it has not paid for. The Court agrees with Mid-Atlantic that summary judgment with respect to its failure to pay is inappropriate at this time.

The doctrines of setoff and recoupment are analytically similar, and often confused. Setoff is a counterclaim arising from an independent claim that a party has against its adversary. Recoupment is the right of a party to have the adversary's monetary claim reduced due to a claim the party has against the adversary that arises out of the very contract underlying the party's claim. *FDIC v. Marine Midland Realty Credit Corp.*, 17 F.3d 715, 722 (4th Cir. 1994) (holding that "[w]hen the amounts owing by each party are determined at trial, the doctrine of recoupment should be permitted to balance the amounts before payment is required.").  Irrespective of whether Mid-Atlantic's claim should be classified as "setoff" or "recoupment," the Court concludes that the triable issues of fact as KPSS's liability (or lack thereof) under the NJFPA precludes a finding that Mid-Atlantic must turn over the funds which it concedes it owes. Should the trier of fact find the KPSS has violated the NJFPA, Mid-Atlantic's resulting liability will be reduced or eliminated.  KPSS's motion for summary judgment as to Count Five of the amended counterclaim is therefore denied.

*ii.    Staffing Requirements/Diversion of Business*

The Court also concludes that summary judgment is inappropriate as to KPSS's other breach of contract claims.  While Mid-Atlantic concedes that it did not maintain the required minimum staffing levels, it asserts that it no longer had an obligation to do so because KPSS had repudiated the agreements when it provided the notice of non-renewal.  Further, Mid-Atlantic does not dispute that it began selling Rusk hair color products after the alleged repudiation.  It argues that the Rusk products that it did sell before KPSS repudiated the agreements were explicitly authorized.  Pl. Opp. Br. at 11.

KPSS again responds that Mid-Atlantic is liable for breach of contract because it continued to benefit from the agreements after KPSS's breach without regard to the corresponding obligations.  For the reasons set forth in the Court's NJFPA discussion, *supra*, the Court rejects the proposition that Mid-Atlantic loses its own claim for breach against KPSS by failing to subsequently comply with the agreements.  The Court will accordingly deny KPSS's motion to recover on Counts Three and Four of the amended counterclaim.

### b.  Trademark Infringement

Count Seven of KPSS's amended counterclaim alleges violations of Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114; 1125, as a result of Mid-Atlantic's continued use of Goldwell products after the RBAs had been terminated.  Given the 23-year relationship between the parties, the factual issues yet to be resolved, the provision in the parties' agreements of a transitional period during which both parties could use the marks, and issues concerning damages (if any), the Court cannot agree that KPSS has established a right to recover under the Lanham Act as a matter of law.  The Court notes a remarkable lack of evidence with respect to confusion over the source of the Goldwell marks.  Mid-Atlantic makes a good point that its

invoices contain a disclaimer about its terminated relationship with KPSS.   Moreover, Mid-Atlantic was selling genuine Goldwell products.   In short, KPSS's arguments have more relevance at the preliminary injunction stage.   In this context, they partake more of hypothetical horribles, and the Court denies KPSS's motion.   *In limine* motion practice may be the best vehicle for resolving whether trademark claims belong in this litigation.

### B.  Mid-Atlantic's Motion

Given the Court's discussion of Mid-Atlantic's NJFPA claim above (which it incorporates herein), it need spend little time disposing of Mid-Atlantic's NJFPA-based cross-motion.   Viewing the facts in the light most favorable to KPSS, the record patently establishes a triable issue of fact regarding a number of issues, including (but not limited to):  (1) whether or not the parties engaged in a course of conduct suggesting a *de facto* multi-state franchise agreement; (2) whether KPSS accurately calculated Mid-Atlantic's 2006 "Net Sales" under the RBAs; (3) whether Mid-Atlantic's alleged failure to meet its 2006 sales quotas provided it good cause to refuse to renew the RBAs; (4) whether KPSS representatives assured Frankel that KPSS would be renewing the RBAs; (5) whether Mid-Atlantic's conduct after it received the notice of non-renewal provided a further good-cause basis for refusing to renew the RBAs.  The Court is ill-positioned to determine, on the record before it, whether KPSS had good cause to fail to renew the RBAs.  It therefore denies Mid-Atlantic's motion.

## VI.  CONCLUSION

For the reasons expressed above, the Court **denies** KPSS's motion for summary judgment in its favor on Mid-Atlantic's NJFPA claim (Count One of the amended complaint).  The Court **grants** KPSS's motion for summary judgment in its favor on Counts Two, Three, Four, and Five

of the amended complaint.   Additionally, the Court **denies** KPSS's motion for summary judgment in its favor on its own amended counterclaim.

The Court **denies** Mid-Atlantic's motion for summary judgment in its favor on the NJFPA claim asserted in Count One of the amended complaint.


An appropriate order will issue.


/s/  Katharine S. Hayden

KATHARINE S. HAYDEN, U.S.D.J.


Date:  March 31, 2009